We'll call the last case for today, Leit Wolde-Argett. It's Brett Horvath versus Sidney Leander, Texas, et al. Mr. Bishop, back up. May it please the court, I'm prepared to address retaliation in the First Amendment claims, but I want to spend most of my time on the discrimination liability question, because that was the big issue for the district court. Of course... Why wasn't the constitutional claim the bigger issue of the law? I think the constitutional claim, the resolution of the constitutional claim, simply piggybacked off the resolution of the discrimination claim. Different standards, I'm not sure why that would be true. Is this a generally applicable policy, or were there exceptions? No, I don't think this was a generally applicable policy concern, the wearing of a respirator. The only people that were forced to wear a respirator were those that had questionable immunity to pertussis because of a religious objection to taking the booster. Everyone else had questionable immunity to pertussis because the booster's not that effective, it doesn't last that long. And some of the firefighters, the fire chief believed, actually had a test confirming the lack of immunity, and none of those were forced to wear a respirator. So that policy is not generally applicable. So that means Oregon v. Smith, or Employment Division v. Smith, doesn't apply. This is subject to strict scrutiny then? I believe that's correct. Obviously this is a summary judgment case. That means the city was required to prove it reasonably accommodated, Mr. Horvath, as a matter of law. That can be either changing working conditions in his current position or offering a transfer to a reasonably comparable position. The most obvious accommodation in this case was to leave Mr. Horvath in his position, exempt him from the TDAP booster requirement. That's what had been done when the city started requiring the flu shot a couple years earlier. That's what's recommended by the National Fire Protection Agency, the international body that creates health and safety standards for the fire service. The city claims this would have been an undue hardship because Mr. Horvath would have posed a health and safety risk. There just isn't any evidence in our record that supports that claim. The only witness who addressed the risk that would be posed by Mr. Horvath working as a firefighter without the booster was our expert who said that risk was negligible. That's a de minimis cost that's not undue hardship. Your client was exempted from the flu vaccine mandate, right? On multiple occasions, yeah. Is there any evidence in the record as to why an exception is permitted for flu but not for whooping cough? Why is one more dangerous than the other? The fire chief said he believed it was more dangerous, but I don't believe that was really backed up by anything. He's not a doctor, right? He's not. He claimed to be relying on a doctor with the health district that's a family practitioner. The city refused to go with that obvious accommodation. It did offer two accommodations. Those both would have imposed significant burdens on Mr. Horvath, but the city argues they're both reasonable as a matter of law. Of course, in all but the clearest situations, reasonableness is a fact question that's not appropriate for summary judgment. And here we've got three major fact questions that have to be resolved as part of that reasonable analysis. The first one applies to both of the accommodations that the city proposed, and that's the question of proportionality. Whether there's sufficient justification for the burdens that these accommodations would impose on Mr. Horvath. Cosme v. Henderson out of the Second Circuit is the leading case that tells us this can be part of the reasonableness. As I mentioned, there's no evidence in this record of risk posed by Mr. Horvath firefighting without this booster. The fire chief said the concern was that he might get pertussis. The record shows there's on average a .001% chance of that. Fire chief said he was concerned that after he got that .001% chance, he might pass pertussis on to somebody else without having any symptoms. And there's no record evidence to show that's even scientifically possible. And so we think that a finding that there are fact issues on proportionality is actually very generous to the city. And it could easily be ruled that there's no record evidence justifying the burdens. The only real thing the city has pointed to in support of risk is a CDC recommendation that health care workers get the TDAP booster. But the CDC also says only around 17% of health care workers have actually gotten it. And the CDC doesn't recommend making the boosters mandatory or firing firefighters who don't take them. The CDC doesn't even recommend making them mandatory in hospital environments. If the policy is required for everyone, even though it may not be the wisest policy, it doesn't seem to me to lend support to a claim of religious discrimination. It may be dumb and stupid, but they require it for everyone. He's not being singled out for it. If it's applied to everyone, he's not being singled out at all. He's not being singled out for the booster. That's not really my point. My point is that both sides. I thought that was your point. I thought that was your point, that some people get exemptions, just not your client. That there are those who take who are not vaccinated or not, not successfully vaccinated. They're not immune. And while they wait for the next vaccine, they do not have to undergo any of these requirements. That's correct. There's an exemption for them, just not for your client. That's right. The respirator requirement is not uniformly applied. The vaccine booster requirement seems to be universally applied. The point that I was trying to make is that both sides have agreed and both sides of experts have agreed that there are a range of possible accommodations that can be used here. And in evaluating which of those are reasonable or for which of those are there fact questions about reasonableness, it's appropriate to look at what is the justification for each of those accommodations. And so if the justification for the respirator mask is it's going to be a big risk. If you don't wear it, if it's actually not true that there's a risk there, that goes to the reasonableness of that accommodation. And we think there are fact issues. We have an international body, the NFPA. They say what a fire department should do is just put a piece of paper in someone's personnel file when they decline a booster. There was not a single witness that says Mr. Horvath is at elevated risk to get and transmit pertussis if he works as a firefighter without this booster. And especially not taking into account all the extra infection control measures that he agreed to abide by in negotiations with the fire chief. The second of the three fact questions pertains to the offered transfer, which is what the district court's ruling was based on. This court has joined other circuits in ruling that in order to be a reasonable accommodation, an offered transfer must be to reasonably comparable employment. The city hasn't even taken the position in this case that taking complaints, doing inspections, and writing tickets Monday to Friday, 9 to 5, is reasonably comparable to fighting fires and responding to other emergencies on 24-hour shifts. And I think for good reason. Even the fire chief agreed that code enforcement is the least desired job in the department with an unfavorable schedule and undesirable job. And for Mr. Horvath specifically, he would have to sacrifice more than half his income to take this much less desirable job. But this is the same pay. It's the same pay from the city. That's right, Your Honor. Why is that? That sounds pretty reasonable. I mean, it may not be what he wanted, but that's a reasonable accommodation, isn't it? I think this is unique to the fire service in that the ability to moonlight is part of the attractiveness of the job and is more common than in other professions. And so for a more typical profession, I think that argument would be stronger. That as long as the income from the direct employment doesn't change, Your Honor. The case law doesn't support that theory? Not that I'm aware of, Your Honor. The third of the three facts questions is on the reasonableness of the constant respirator requirement for Mr. Horvath to retain his firefighting position. The district court didn't reach that because of its ruling on the transfer issue. Very quickly, here are just a few reasons a jury could find this requirement unreasonable. The fire chief who proposed it said it would be difficult to impossible to do firefighting work in the respirator. Our medical expert agreed the respirator would make firefighting much more difficult and dangerous. The fire chief didn't require respirator use for firefighters. He thought had a test confirming lack of immunity to pertussis. And there was a less restrictive alternative that offered all the same medical benefits, which is a surgical mask, that was not considered. And so we think there are fact questions for a jury to resolve on the reasonableness of the respirator. And it's our position that the discrimination claim was erroneously dismissed and we're asking for it to be reviewed. Very briefly, I want to also touch on the retaliation claim, which there are also fact issues on. The district court's analysis was that our retaliation claim was essentially just a rebranding of the discrimination claim. But that misses the mark. The retaliation claim is based on protected activity that Mr. Borgoth engaged in by writing the fire chief a letter in which he said he'd agreed to extra infection control measures and that because there was no medical support for adding a constant respirator requirement on top of those measures, it appeared that religious discrimination and harassment was motivating that requirement. Mr. Borgoth had a good faith belief that he was opposing an illegal practice in that letter. The city actually doesn't dispute that he had a good faith belief. The fire chief decided to fire Mr. Borgoth four days after receiving the letter. And the city even says in its briefing to this court that decision was made because Mr. Borgoth's letter was improper and insubordinate. Add in the facts that the parties had been at odds on accommodations for months, but as soon as Mr. Borgoth said he thought he was being discriminated against, he was fired. And the fact that the fire chief lied about having an investigation determine Mr. Borgoth's disciplinary faith, even though there's evidence he had already made that decision, and there are fact questions all over the place on retaliation. Why was this policy introduced four years after your client started as a fireman? Is there any evidence on the record why the city all of a sudden in 2016 needed this requirement? I think the best evidence is that right around this time the city obtained a grant from FEMA to pay for the vaccinations. I believe the fire chief also said that he looked to the CDC recommendations and the local health district recommendations. I don't recall anything about that being tied to this specific point in time. The city's main argument in support of the dismissal of the retaliation claim tries to fit the case within the doctrine that opposition to discrimination is unprotected if it interferes so much with the employee's job performance that it renders him ineffective. The city hasn't explained how that applies to writing a letter, which didn't interfere at all with Mr. Borgoth's ability to fight. So we asked for that argument to be rejected, and the retaliation claim remanded. I do have a couple minutes, and so let me talk very briefly about municipal liability. The district court found there was no policy and that even if there was, it was neutral and generally applicable. I think I talked a little bit already about the general applicability. But on the policy, there was plainly a decision by the fire chief. The personnel manual is in the record that empowers him to make fire department policy and to make hiring and firing decisions for the fire department. His decision was that if a firefighter has uncertain immune status because of a religious objection to the booster, then we've got to take this drastic action. But if a firefighter has uncertain immune status because of all the other reasons, then we don't have to do anything. That person can keep firefighting as they always have. That's a policy. It was the adoption of a course of action to respond to this situation. I don't think there's any way to say with a straight face that it's neutral toward religion. Or at the very least, there are fact questions on that. And the individual capacity claim should be remanded for essentially the same reasons. It's clearly established that non-neutral state action burdening free exercise of religion violates the Constitution and that religious retaliation is unconstitutional. I think we've shown that we've got fact questions on our claims that the fire chief did both of those things, and so the individual capacity claim should survive. Any other questions? Thank you, sir. May it please the court, my name is Joanna Salinas. I represent the city of Leander and their fire chief, Mr. Gardner, in this lawsuit. What we have here is an emergency medical provider who did not want to undergo the mandatory vaccines that were being applied to anyone who provided medical attention. I'm sorry, what do you mean by emergency medical provider? All of our firefighters at the city of Leander are dual certified as EMTs and firefighters. They are all first responders, and the evidence is in the record. I forget their first responders, but they serve both a fire role and a medical role? Yes, he is certified as an EMT, and all of our firefighters are required to be EMT or higher. Because they're first on the scene, they need to do it. Exactly, and it's well known how much time firefighters spend fighting fires versus responding to emergency medical calls, especially in a small community. In a larger city like Austin, they probably don't have all their firefighters providing medical attention. But in a city like Leander, that was a required part of the job description. So this wasn't a policy that was invoked because we thought the city needed to have mandatory vaccinations. This was a policy that was put in place to deal with anyone who provides medical attention. How many are there? Your Honor, I'm not sure at that time how many there were, frankly. This was the only exemption request that we received from the vaccination policy, and I think you had asked about why did this come up. It came up as part of an infection control plan, an overall policy, which has become very common in the last probably five, ten years. Maybe the city of Leander may have been a little slower than most, being a smaller community. But we adopted an infection control plan a couple of years earlier, which is how the influenza vaccine came up. And then about a year or two later, we introduced an overall health safety program, which has become a huge issue for firefighters. So why exempt for flu but not for whooping cough? It's not that it was exempted. It's that the nature of the accommodation was different. Did you require Mr. Horvath to do the flu vaccine? We did not require him to do the flu vaccine. We accommodated his request by allowing him to not undergo it, but you have to keep track of his temperature, having to wear a mask during certain times. And so they were less restrictive than what we required under the TDAP. So what's in the record to justify that disparate treatment between the two? Between the two vaccines. Just a difference of the risk and what was generally being done as a practice. The flu vaccine, frankly, several places in the country, there's a few cases that deal with a number of hospitals that have actually not agreed to accommodate and they've only transferred. But we understood after talking to the health department there that here's a way that some people have done it. And that's what we did. I want to be clear. Is there evidence in the record that indicates that whooping cough is a substantially bigger concern for the city than the flu? It's a different concern. Right. So I would just say that the way of protecting from it is different. Not necessarily that it's a bigger risk. But even in the record, we've got the CDC discussion of TDAP and what its risks are and the dangers. Does the CDC say that exemptions are OK as to flu, but definitely don't do that as to pertussis? CDC doesn't make recommendations on accommodations at all. Not one way or the other. I'm not hearing the evidence as to why it's OK to exempt one but not the other. It's not that one was exempted. Right. Our position is we were willing to allow him to continue to work as a firefighter. But the nature of that's called an exemption. I'm not sure why we're having a nomenclature discussion. I think you said the flu vaccine was not required as Mr. Vargas. It was accommodated with some. He didn't have to do it. He didn't have to do it. He did not have to do this one. Well, it was the subject of these accommodations. Right. The same thing. We had the same response, right, with the TDAP, which was not we're firing you because you said you won't undergo TDAP. It was here are the two ways we're willing to accommodate your request. It was the exact way we responded to the flu. But the accommodations were different. What do you do sticking with the process then? What is this? I'm understanding about the exemption provided for those who aren't immune. There is no there is no way and that this is referred to this. This will refer to exemption. It referred to what Mr. Horvath has argued and what our chief talked about. But what is also in the record from Dr. Shin and the CDC is you cannot test for whether or not the vaccine has effectively done what it needs to do. Now, our police chief talks about firefighters who are directed. When a firefighter would follow up testing. Apologies. Let me start over with a follow up testing reveals the vaccine did not confirm unity. Those firefighters are directed to receive a second round of vaccinations and are not required to wear a respirator while on duty in the interim. Thus, one could argue, according to this report, the policy is not neutral or generally applicable. It violated Horvath's right to free the exercise of religion. Well, I would point out two things. One is, while that was true, that is actually not applicable to the vaccine. That was that was and I understand that's what the record has in it. But what the record also shows is that there is actually no test. There are other vaccinations that we've required that you can do testing for. And frankly, that is just our fire chief not being an expert in knowing what vaccines do which. And so he did testify to that. But what is also true is we did not require Mr. Horvath to wear a respirator during the two months that we were having these discussions with him. I apologize. I think I missed what you said. You're disagreeing with the statement. I disagree. And tell me why. I just I miss why. Because the vaccine cannot be tested for. It just can't. I don't I don't disagree that in the record, our fire chief misspoke and says that it can. And he was referring to other vaccines. However, what is also in the record, you hear it from Dr. Shin and her testimony and you can see it in the CDC. It cannot be tested for. It just isn't one of those. And Dr. Shin talks about that at length in her deposition. And it's in the record. It just is not. There are other vaccines that you can do that for. And the fire department policy that was described by the chief works that way. But it is it is clear from the medical evidence. It cannot be tested for. So if you do the protesters vaccine or TDAP, apologies, you just do it. And there's no way to determine whether it worked. Absolutely. Just like the influenza vaccine, just like most vaccines, very few vaccines. Can you actually pass for efficacy? T-DAP is definitely not one of them. So how did the district court misunderstand the record then? Because the fire chief spoke in his deposition about vaccines that were given because T-DAP wasn't the only one. There was a laundry list of vaccines that the individuals had to undergo. And so T-DAP is just one of them. There were other vaccines that were required. I believe measles is one that can be followed up for efficacy. And so there were other ones that could be. They would test for it right away. If they couldn't, they'd go right back in and get another shot. But this isn't a two year experience. If it's not good, they know and they go back in. So there's an exception for measles if you can confirm its success effectiveness. If it's not effective, you don't impose these equipment requirements. You just let them come back later. Is that correct? Well, they have to go right back. But that's all in a very short time. This isn't a big time period. It isn't. And it's not it's not something people go through again. Right. At normal hospitals, what happens is before you start the job, you have to be vaccinated. Now, it's harder for us because we had a group of employees who had to now all get on board. But it's all a matter of just onboarding. This is not about like ongoing problems. You don't have ongoing employees who are being tested for efficacy and then you're having to do something. This was just getting the program started, which is the same reason that Mr. Horvath was not asked to wear a respirator during the two months he continued to work for us. And that we knew he hadn't undergone the vaccine. Right. Everything was being done. It was being put into place. We were sending our firefighters out there. We were doing that work. But once it's done, you're done. Right. You don't have this idea that we have a policy is no different than what we allowed Mr. Horvath to do, which is not to do anything while we looked at accommodation. So the fact that you let him continue on for the two months, how does that cut? Well, it cuts in the fact that this is a new policy. Right. It's it's because we weren't doing this before and now we are. But that's what happens when you change safety protocol. Right. When you change your safety protocol, you're going to have to deal with putting it in. And if what Mr. Horvath has said was, well, I can't do this because of my religion. But in three months I can. Then the city would have to have looked at whether it could wait three months to let him do whatever needed to be done. So because you're in an ongoing you're in a fluid situation as you're getting everyone up to speed. Right. The minute we wrote the policy, we could not get 100 percent compliance. And so the idea that the city has got a policy or is setting a bad appearance by not being able to instantaneously comply with what it's doing doesn't really make sense. Right. It needs to have an opportunity and it can't be used against it. That gives its firefighters a chance to get everything done. Right. We couldn't do it immediately. But once you're done and when we're now hiring new people, people don't come on board. Right. To this day, are you allowing religious exemptions for flu? I don't know what they're doing, Your Honor. Currently, to be honest, for me, it's a limited representation. So I honestly can say I don't know. But I believe that's in the record that at least as Mr. Horvath, he was exempted. He was exempted from the flu vaccine with the accommodations we agreed to. Right. Which is he's keeping a log of his temperature. Right. It's not that I understand. And the record does reflect that the city was not willing to provide those same exemptions slash accommodations. As to Pertussis. As to Pertussis, we had accommodations that were just more significant. Right. So as opposed to just. Why more significant? What's the evidence to justify that in the record? If there is any. Yeah. I mean, the evidence is that after the fire department spoke to a number of different people about what people were doing and what they heard from a number of people is we're not accommodating at all. And that's what Dr. Shins testimony. So while influenza was being accommodated, they are not. Baylor, Scott and White. The evidence is the city of Leander talked to other municipalities to just sort of check in to see what they were doing. Talk to other talk to other municipalities. Talk to the county and health department. Talk to you did their own research online. There isn't a clear exemption of what is the right way. Sort of survey of practices, not actual medical evidence as to how the flu is not that big of a deal, whereas whooping cough is a really big problem. No, but you see in basically your two expert reports that same thing. Right. What what their expert testified to in his report was not that we didn't need to do anything more than we were doing flu and influenza. Right. His his actual conclusions are that we actually could be should be doing more. Right. He should be what he recommended was any time he's going anywhere where someone could be coughing or sneezing any time. Are we talking about flu or. No, we're not talking about the flu. Well, that was the exemption that wasn't required for this. Well, you know, from just from a layman standpoint and and watching public schools and vaccinations and so forth. Correct me, but my my impression has been that that whooping cough can be lethal to children in particular. And you have a vaccination programs in public schools, not just in and whatever. And you have the first responders going out and administering first aid, et cetera, to including two children, too, et cetera. So that that may be just dead wrong. But that but but I am not a complete stranger to whooping cough. I've run into it. All I know is what I've learned in the courtroom. So I will throw it out to you. Does the record reflect any of that? It does, Your Honor. I mean, in the CDC discussion about the. We're on the record. Apologies. I don't know the CDC section. So if you look at the record in the area of kind of six, 28 through six, 37 is the CDC discussion about pertussis, what its risks are, that it can't be tested for efficacy, that it particularly is should be required for health care workers. And then basically kind of how dangerous it is. It has secondary attack rates within families of like 80 percent. I mean, it is a very serious and it can, unlike influenza, which kind of just travels. You tend to have more epidemic, more similar to measles. We'll see if those pages you'll see a CDC discussion of why flu and whooping cough are different. You will not see a comparison because this is this is a section only on pertussis and it's about pertussis. And so you understand why I'm asking. I'm sorry. You understand why I'm asking is the whole point of the employment division versus Lukumi dichotomy is that when you provide exemptions, that necessarily raises the scrutiny level. If it's generally applicable, then that's then it's a rational basis. We need to scrutinize these exemptions very carefully. But the difference on exemptions wouldn't be between influenza and TDAP. Right. Because we provided the difference in exemptions is usually what you were providing to accommodate for someone's religious rights and what you were accommodating for people who don't have a religious concern. And there is no evidence that we offered any type of accommodation to anyone who didn't have a religious concern. And there's no evidence that we frankly accommodated an influenza request that wasn't Mr. Horvath's religious one. Other than the district court statement that you that you say is erroneous. Right. What I think cuts against what it cuts against the idea that discrimination is the fact that we looked at the influenza, made a decision. We may or may not be right. We may or may not be protecting the public as much as we should from influenza. But we did our own balancing and accommodated that request. And we did the same thing when it got to TDAP. And the Supreme Court's been very clear about what the accommodation needs to be. And I don't think that difference between what we did for influenza and TDAP can be said to be as to religion because both were for Mr. Horvath. Right. If we had allowed a non-religious person an exemption to flu, then I think there would be something to compare. But both were for Mr. Horvath. So clearly that's not a religious thing. I think the reason why they might be connected, and I'll acknowledge it's not quite the same dichotomy as Lukumi and employment, but I think it's analogous. The point is if you've got a series of policies and you're allowing exemptions for one but not the other, shouldn't there need to be an explanation as to why? Right. Otherwise it sounds like exemptions are in fact okay. Right. And I don't think there is any – the idea that we have this history of exemptions is not what the record is. The record is the chief's testimony, which I've told you is erroneous. But if we just say what the chief said, if someone gets tested for efficacy and doesn't have it, we don't make them do something before they go back and get it fixed. But that's, again, the same thing as for Mr. Horvath, that for two months we didn't fix this immediately. I guess what I'm wondering is it may very well be that your policy is fine. The problem I have is there's not enough in the record, presumably because the court didn't even look to this exemption analysis. It just immediately fought employment division without a lot of discussion or analysis. And I would say frankly that – and Sonia versus Philbrook tells you that's what you're supposed to do, right? Philbrook comes in and says, look, any reasonable accommodation suffices, and we don't look to what he would rather have, right? If Mr. Horvath would rather stay and be a firefighter and provide people medical – emergency medical attention, we don't look to that. And we don't have to prove that everything we did about our policy is right or is the best policy in the world, as long as we didn't invoke this policy of requiring – I don't think that sounds like strict scrutiny. Well, it's not. That is – so you're talking about the First Amendment side of things, right? Exactly. Exactly. I think the problem with the First Amendment assessment is what is the policy? And I don't think what the policy is we have a mandatory set of vaccines and we accommodate some of them differently, but we're not accommodating them differently because of people's religion. And that's what the question is, right, is whether we've changed our accommodations because of someone's religion. And that's not – there's no evidence of that because the accommodations were both for Mr. Horvath. And so to say that's not what happened here – and then I think you then have to start talking about the undue hardship and looking at whether we need to guess right. And the difference between this type of exposure and maybe other types of accommodations is this isn't just about Mr. Horvath's employment, and it's not even just about his coworkers, which is what most kind of safety risk analysis is about. This is about members of the public. And so maybe we're not doing enough for influenza and we could do more. Maybe Tdap could be done differently, but there's no evidence that any of the decision-making had anything to do with religion. It had to do with trying to get it right, to balance – But just to be clear, the Constitution doesn't require intent in this context. It doesn't, but without the intent, what you have is a facially neutral policy. Our policy is that Tdap vaccines are mandatory. And so that's what you have. And I think similarly with our retaliation claim, we told Mr. Horvath you need to decide which accommodation you want, and he never picked. And so the idea that this was a decision made based on discrimination or retaliation is not supported by the evidence. The accommodation discussion from the courts has been that almost anything suffices. And that's a little strong, but Brough sort of says that. If you don't want to work with the restrictions at the fire department that we had for you, we gave you the very best job we could have. And we didn't even just make it available, which is what the vast majority of these cases now talk about. Sorry, but you've exceeded your time. Yes. Thank you. Appreciate it. You have five minutes on rebuttal. I want to pick up where Ms. Salinas left off in talking about Brough and the idea that almost any accommodation can meet the reasonable accommodation standard. I do think that the cases are sort of trending that way, but the word reasonable and the phrase reasonable accommodation has to mean something. So if an employee requests a religious accommodation, and it would be trivial for the employer to grant that accommodation, but instead the employer says you can transfer to a janitor position working overnights for half the pay or you're going to be fired, and the answer is that's a reasonable accommodation as a matter of law that a jury doesn't even get to weigh in on, then that's a big step back for what the protections are for religious discrimination in Title VII. And there's no case that I'm aware of holding that a significantly worse job with a worse schedule that leads to a significant loss of income can be a reasonable accommodation as a matter of summary judgment, and this court shouldn't be the first court to so hold. I want to spend the rest of the time picking up on this question about what's the difference between accommodating flu and accommodating pertussis and respond to some of the things Ms. Salinas said and then end with a suggestion for what a jury could find that's supported by the record. I heard Ms. Salinas say the city checked around on what other places were doing and heard we are not accommodating exemption from TDAP. I challenge the court to find any evidence of that anywhere in the record. That's just not in there. The person who said this can't be accommodated, that was Dr. Shen, the family doctor from the health district, but what the fire chief thought she said was use the 24-hour N95 respirator. I heard Ms. Salinas say how you protect against transmission of flu and pertussis is different, and that's affirmatively contradicted by the record. These are infections that are spread by droplets, coughs and sneezes, and so the same things that worked for Mr. Horvath with the flu, which is selective wearing of the surgical mask, monitoring body temperature, not coming in with a fever, and then being subject to additional screenings when having cold and flu-type symptoms, coughing and sneezing, also would have worked with pertussis. What in the record specifically, what page site contradicts what counsel said? What contradicts the spread? How? I'm just following up. You said the record contradicts what was just said. Give me a page site if you could. That's right. It's in our expert report, which starts at page 922 in the record. It talks about the transmission. What do you make of our discussion earlier, the district court's statement that there were exemptions provided for Tdap, for those who were not successfully immunized? Was that a correct statement of fact by the district court, or was that mistaken, as was suggested? I agree with Ms. Salinas's interpretation of that. There were exemptions from wearing a respirator for people that the fire chief believed had been proven to lack immunity. I believe she's correct that that test does not actually exist, and the fire chief was wrong about that, that he had tests showing lack of immunity. I think a set of facts that a jury could find about why flu was treated differently than pertussis is that the fire chief's religious animus was building, and here are the building blocks of that. Number one, when Mr. Horvath first requested exemption from the flu vaccine, the fire chief said, I question the science behind your request. Part of the reason was some of the cells in some of the flu shots originated in aborted fetuses, and Mr. Horvath cited that as part of the reason. The fire chief says, I question that science, even though it's indisputably true. Mr. Horvath testified in his deposition for the second flu vaccine. The fire chief said, you can be exempt from this, but if you keep pushing this exemption stuff, you're going to have an issue. Where are those in the record? I apologize. That's in the fire chief's deposition. I don't have a page in line. That's in your brief. I don't believe it is. I'm happy to submit a letter brief tomorrow to the court. The initial reaction when Mr. Horvath asked about exemption from Tdap right that moment was you have the right not to take vaccines, but you don't have the right to have a job here. And the fourth and final thing is all the lies that the fire chief told about how this process played out on the Tdap booster request. And that's all in the briefing. I see I'm out of time. The case is submitted. That completes our oral arguments for today. Court will be in recess until 9 a.m. tomorrow morning.